NANCI L. CLARENCE (SBN 122286)
GINA MOON (SBN 257721)
Clarence Dyer & Cohen LLP
899 Ellis Street
San Francisco, CA 94109
Tel: (415) 749-1800
Fax: (415) 749-1694
nclarence@clarencedyer.com
gmoon@clarencedyer.com

Attorneys for Defendant
ELENA MORENO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR-12-00750-03-LHK |
| Plaintiff, | |
| v. | **DEFENDANT ELENA MORENO'S SENTENCING MEMORANDUM** |
| ELENA MORENO, et al., | Sentencing Date: January 21, 2015 |
| Defendants. | Time: 9:30 a.m. |
| | Judge: The Honorable Lucy Koh |

1

# **TABLE OF CONTENTS**

2  I.      INTRODUCTION.............................................................................................. 1

3  II.     BACKGROUND................................................................................................. 1

4          A.      Elena Moreno. ...................................................................................... 1

5          B.      The Charges and Ms. Moreno's Guilty Plea. ....................................... 3

6          C.      The Probation Office's Recommended Sentence.................................... 4

7          D.      Ms. Moreno's Requested Sentence. ....................................................... 5

8  III.    ARGUMENT ..................................................................................................... 6

9          A.      The Court is Not Bound by the Guidelines and Must Instead Consider the
10                 Factors Enumerated in 18 U.S.C. 3553(a) to Determine a Proper Sentence........... 6

11         B.      Ms. Moreno's Requested Sentence Provides for Sufficient, But Not Greater
12                 Than Necessary, Punishment and Best Achieves the Goals of § 3553(a)............... 7

13                 1.      The Requested Sentence Reflects the Nature and Circumstances of
                           the Offense. .............................................................................. 7
14

15                 2.      The Requested Sentence Will Avoid Unwarranted Sentence
                           Disparities................................................................................ 11
16

17                 3.      The Requested Sentence is Appropriate in Light of Ms. Moreno's
                           History and Characteristics. .................................................... 13
18

19                 4.      The Requested Sentence Will Provide Just Punishment and There is
                           Little Risk That Ms. Moreno Will Reoffend.............................. 16
20                 5.      The Requested Sentence Will Better Allow for Ms. Moreno to
                           Provide Restitution to Victims of the Offense. ......................... 17

21         C.      Objections to Presentence Report. ....................................................... 17

22                 1.      There is No Basis to Apply a Manager/Supervisor Enhancement. ........... 17

23                 2.      There is No Basis for the Presentence Report's Speculation that Ms.
                           Moreno Has Had "Anger Management Issues." ...................... 20
24

25                 3.      There Has Been an Insufficient Showing that Forfeiture, in Addition
                           to Restitution, is Appropriate. ................................................ 21
26

27 IV.     CONCLUSION ................................................................................................ 21

28

DEFENDANT ELENA MORENO'S SENTENCING MEMORANDUM

1

## **TABLE OF AUTHORITIES**

2

*Cases*

3
*Gall v. United States*, 552 U.S. 38 (2007) ........................................................................ 6

4
*Kimbrough v. United States*, 552 U.S. 85 (2007) .............................................................. 6

5
*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................... 6

6
*United States v. Booker*, 543 U.S. 220 (2005) .................................................................. 6

7
*United States v. Brown*, 771 F.3d 1149 (9th Cir. 2014) .................................................. 21

8
*United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) ................................................ 16

9
*United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) ....................................................... 17

10
*United States v. Luca*, 183 F.3d 1018 (9th Cir. 1999) ..................................................... 21

11
*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) ......................................... 17

12
*United States v. Monaco*, 23 F.3d 793 (3d Cir. 1994) ....................................................... 9

13
*United States v. Redemann*, 295 F. Supp. 2d 887 (E.W. Wis. 2003) ................................ 9

14
*United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995) ........................................................ 9

15
*United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012) .................................................. 19

16

17

*Statutes & Guidelines*

18
18 U.S.C. § 3553 ........................................................................................................ passim

19
U.S.S.G. § 2B1.1 .......................................................................................................... 9, 10

20

21

22

23

24

25

26

27

28

DEFENDANT ELENA MORENO'S SENTENCING MEMORANDUM

## I.   INTRODUCTION

Defendant Elena Moreno stands before this Court for sentencing after entering a guilty plea to tax fraud conspiracy and bank fraud conspiracy.  Ms. Moreno accepts responsibility for her actions and struggles mightily with how to reconcile her crimes with the values of honesty and integrity she tries to impart daily to her children.  She deeply regrets letting them down, harming society, and turning her back on her core principles.  Recognizing that she must pay the price for her misconduct she also agonizes over how to care for her dependents in view of the impending incarceration of her, her husband, and her brother-in-law.  Seldom does a case present such a decimation of a once-thriving, closely-knit family.  While Ms. Moreno understands that the unhappy circumstance she finds herself in is the result of her own wrongdoing, she nonetheless implores the Court to vary downward from the severe guideline range applicable to Ms. Moreno's case and sentence her to a term of incarceration not exceeding 12 months and one day.  For the reasons described further herein, there is no legitimate sentencing purpose that would be achieved by incarcerating Ms. Moreno in excess of this proposed sentence, and the requested sentence is sufficient but not greater than necessary to reflect the seriousness of her conduct, promote respect for the law, and create parity among similar defendants, while minimizing the displacement and hardship that her dependents will experience as a result of the incarceration of both of their parents/caretakers.

## II.   BACKGROUND

### A.   Elena Moreno.

This case involves multiple generations of a family riven by poverty and displacement  – that rose out of drug and alcohol addiction and domestic violence to stability – only to be torn apart because they put their craving for the full trappings of a middle class lifestyle above prudent, careful, and honest decision making.

Ms. Moreno is 40-years old and was the fourth of seven children.  Dkt. No. 111 (hereinafter "PSR") ¶ 57.  She grew-up in a two-bedroom apartment with her siblings in a home riddled with traumatic physical and verbal abuse by her alcoholic father.  *Id.* at ¶¶ 58-60, 65.  As a

1   result of the abuse, Ms. Moreno's parents separated and Ms. Moreno dropped out of high school.

2   *Id*. at ¶ 60.  Looking for an escape, Ms. Moreno started dating her husband Fidencio – 12 years her

3   senior – when she was 16 years old.  *Id*. at ¶ 62.  Instead of an escape, Ms. Moreno found herself

4   living with a husband who, like her father, was abusive and a serious alcoholic.  *Id*.  By the time

5   she was 18, Ms. Moreno had two children.  *Id*.

6         Despite this difficult beginning, both Ms. Moreno and her husband found religion and

7   through that avenue, found solace, inspiration and true community.  Through the help of their

8   church, Fidencio stopped abusing drugs and alcohol and found employment as a bus driver.  He

9   was good at his work and this, in turn, helped him gain self-respect and put an end to self-abuse

10  and the abuse of his young wife.  Eventually, with money lent to him by his mother, Fidencio and

11  his brother (Arturo) started their own bus company, Quality Assurance Travel, in 2002.  About

12  four years after Quality Assurance Travel was started, Ms. Moreno left her job as a receptionist

13  and joined the family business.  PSR ¶¶ 75-78.  Ms. Moreno continued as a receptionist – which

14  was the job she had worked in for over 10 years – but also took on some of the billing and

15  bookkeeping responsibilities at QAT.  PSR ¶ 75; Dkt. No. 101 at p. 4.

16        Today, Ms. Moreno lives with her husband Fidencio, two daughters (ages 5 and 11), son

17  Eddie Angel (age 22), and mother-in-law and father-in-law (ages 74 and 77).  PSR ¶ 62.  Ms.

18  Moreno's second oldest child, James (age 21), is currently in college and will be the first member

19  of the family to graduate college.  *Id*.  Ms. Moreno is the primary caretaker for her two daughters

20  and elderly in-laws and continues to work at QAT.[1]

21        Church has been the cornerstone to Ms. Moreno's life after it helped her husband recover

22  from his addictions and Ms. Moreno and her husband have endeavored to help and support other

23  members of their community who struggle with the problems that once plagued them.  Ms.

24  Moreno serves as a mentor in the Celebrate Recovery 12-step program, provides couples

25  _____

26        [1]  A description of the dependents at issue in this case, as well as a proposed family plan for when
      the defendants are incarcerated, was previously provided to the Probation Office.  A copy of this
27    submission is attached as Exhibit A.

28

counseling, volunteers as a Sunday School teacher and child care provider, and also performs church outreach. PSR ¶ 63.

### B.    The Charges and Ms. Moreno's Guilty Plea.

Life changed for the extended Moreno family on July 14, 2010 when heavily-armed IRS and federal agents burst into their business office shouting: "Where are the guns! Where are the drugs!" There were never guns or drugs so none were found but what followed was a lengthy investigation culminating into an indictment which included Ms. Moreno who, unlike her husband and husband's brother, had not been represented by counsel in the investigative phase.

The original indictment in the above-captioned matter was filed on October 18, 2012 and alleged tax fraud conspiracy and filing a false tax return against Ms. Moreno, her husband Fidencio, and her brother-in-law Arturo. Dkt. No. 1. Trial was originally scheduled for October 28, 2013; however, at government counsel's request, this trial date was continued to March 10, 2014 to accommodate a personal scheduling issue. Dkt. No. 49.

Two months before trial, the government obtained a superseding indictment which added bank fraud/wire fraud conspiracy and other charges related to mortgage fraud. Dkt. No. 64. The superseding indictment also added a criminal forfeiture allegation with respect to the new mortgage fraud charges. The case expanded significantly and the punishment that followed increased significantly. The threat of deportation of Ms. Moreno's husband, who came to this country when he was 14, loomed large over the pre-plea proceedings.

As part of a wired plea deal eventually reached with her husband and brother-in-law, Ms. Moreno plead guilty to tax fraud conspiracy (Count One) and bank fraud conspiracy (Count Thirteen) before a new trial date was set. *See* Dkt. No. 101.

With respect to Count One, Ms. Moreno admitted that while she worked at the family bus company, Quality Assurance Travel, she was part of a tax fraud conspiracy with her husband and brother-in-law wherein they failed to report all of their cash receipts to the IRS, resulting in a tax loss of $214,618 over the course of five years.

With respect to Count Thirteen, Ms. Moreno admitted that she was a part of a bank fraud

DEFENDANT ELENA MORENO'S SENTENCING MEMORANDUM

conspiracy with her husband and brother-in-law wherein they made false statements to lenders when obtaining loans to purchase homes for themselves and mother-in-law in the end of 2005 to the beginning of 2007 and made false statements when seeking to modify their loans in 2011 and 2012 when they fell behind on their mortgage payments.  In total, the bank fraud conspiracy involved five pieces of real property – 7535 Bayliss Place ("Bayliss"), 5937 Hillview ("Hillview"), 5839 Chesbro Avenue ("Chesbro"), 5832 Cadiz Drive ("Cadiz"), and 356 Lincoln Avenue ("Lincoln").  Ms. Moreno had a property interest in two of the properties (Bayliss and Hillview), both of which she lived in, but did not have a property interest in the others, which either her mother-in-law lived in (Chesbro) or brother-in-law lived in (Lincoln and Cadiz).  Ultimately, Ms. Moreno's former home (Bayliss) was short sold and her mother-in-law's home (Chesbro) was foreclosed upon.  The Probation Office has determined that these events caused a loss of $219,000 to Wells Fargo Bank and NationStar Mortgage (who had taken over the Chesbro loan from Lehman Brothers Bank).  PSR ¶¶ 20-22.

In the plea agreement, the parties agreed that the combined offense level for Count One and Count Thirteen was either 20 or 21, depending on if the Court applied the supervisor/manager enhancement for the bank fraud conspiracy.  Dkt. No. 101 at 8-10.  The advisory Guidelines range for Ms. Moreno (presuming Criminal History Category I) under the plea agreement is accordingly 33-41 months or 37-46 months.  The government agreed, however, that Ms. Moreno would be permitted to argue for a variance based on § 3553(a) factors.  *Id.* at 8.

The Morenos fully paid restitution ($214,618) for the tax fraud related conduct prior to pleading guilty and have been working to save money to pay the bank fraud restitution.

### C.    The Probation Office's Recommended Sentence.

The Probation Office determined the combined offense level for Count One and Count Thirteen to be offense level 24 and has calculated the applicable Guidelines range as 51 to 63 months.  PSR at p. 25.  The Probation Office, however, correctly recognizes that a number of mitigating factors warrant a downward variance under 18 U.S.C. § 3553(a) and ultimately recommends a sentence of 37 months, in addition to three years of supervised release, restitution

of $219,000, and forfeiture (of an unspecified amount/interest in money and real property). PSR at pp. 25-26.

### D. Ms. Moreno's Requested Sentence.

While Ms. Moreno appreciates the Probation Office's recognition that a downward variance is warranted based on Ms. Moreno's personal life history and family obligations, the Probation Office has not explained its rationale for choosing 37 months, nor how such a sentence is not greater than necessary to serve the sentencing goals enumerated in 18 U.S.C. § 3553(a) (just punishment, adequate deterrence, protection of the public). Further, the Probation Office does not appear to have considered the unwarranted sentencing disparities that would result if Ms. Moreno is sentenced to 37 months. As detailed further below, Ms. Moreno respectfully posits that a sentence of 12 months and one day, followed by a term of supervised release for three years, and restitution to be determined by the Court, is an appropriate sentence that is sufficient but not greater than necessary to meet the sentencing goals enumerated in 18 U.S.C. § 3553(a).

Regardless of the sentence imposed, each of the defendants has a responsibility for ensuring that the seven dependents who will be impacted by the Morenos' incarceration are cared for. They have developed a family plan to address this overriding concern. *See* Exhibit A. As part of implementing this plan, Ms. Moreno respectfully requests that her sentence of incarceration be staggered consecutively with any term of incarceration to be served by her husband Fidencio Moreno and brother-in-law Arturo Moreno (who are both scheduled to be sentenced by this Court on February 4, 2015). If Ms. Moreno is incarcerated simultaneously with her husband brother-in-law, the Morenos' juvenile and elder dependents are at great risk of having their basic living needs go unmet. The appended family plan explains her family's need for staggered consecutive sentences and details how the Morenos plan to work together to support the seven individuals (five children ages 1, 5, 5, 7, 11 and two elderly parents ages 74 and 77) who are fully dependent on Ms. Moreno, her husband, and her brother-in-law and to support the defendants' partial dependents despite incarceration. The government has explicitly promised that it does not oppose this request for staggered sentencing. Dkt. No. 101 at 13.

# III.  ARGUMENT

**A.     The Court is Not Bound by the Guidelines and Must Instead Consider the Factors Enumerated in 18 U.S.C. 3553(a) to Determine a Proper Sentence.**

As the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005) and clarified and reiterated in *Gall v. United States*, 552 U.S. 38, 59 (2007) and *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), the Sentencing Guidelines are advisory only and a sentencing court must consider all of the factors enumerated in 18 U.S.C. 3553(a), not just the Guidelines, in determining a sentence that is "sufficient, but not greater than necessary" to meet the goals of sentencing. Moreover, a sentencing court may not presume that a Guidelines range is reasonable or accord more weight to the Guidelines than the other § 3553(a) factors.  *Gall*, 522 U.S. at 50 (upholding the district court's downward variance from the Guidelines range of 30 to 37 months imprisonment to 36 months of probation based on § 3553(a) factors).  In fact, in certain circumstances, a court must place greater emphasis on the non-Guidelines factors under § 3553(a) in order to deliver a sentence "that comports with federal law."  *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting the "utter travesty of justice that sometimes results from the guidelines' fetish with the absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.")

Under 18 U.S.C. § 3553(a), the Court must consider several factors in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth therein.  An appropriate sentence must:  (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a). Additionally, in determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentences available;" (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

1   guilty of similar conduct;" and (4) "the need to provide restitution to any victims of the offense."

2   18 U.S.C. § 3553(a).  Consideration of these factors in Ms. Moreno's case dictates strongly in

3   favor of a significant downward variance from the Guidelines range.

4   **B.     Ms. Moreno's Requested Sentence Provides for Sufficient, But Not Greater Than**

5   **        Necessary, Punishment and Best Achieves the Goals of § 3553(a).**

6          **1.     The Requested Sentence Reflects the Nature and Circumstances of the**

7          **        Offense.**

          The bank fraud conspiracy that Ms. Moreno was a part of was a conspiracy of three family

8   members who obtained home loans for themselves and their elderly dependents.[2]  As the

9   government itself has acknowledged, the loans at issue in this case were subprime, interest-only

10  loans.  Dkt. No. 77 at 13.  These loans were obtained with the assistance of mortgage brokers in

11  the years immediately preceding the 2008 financial crisis (end of 2005 to the beginning of 2007).

12  *See* PSR ¶¶ 15-17.

13         Ms. Moreno fully accepts that the losses ultimately suffered by the banks when her former

14  home (Bayliss) was short sold and her mother-in-law's home (Chesbro) was foreclosed were the

15  result of false statements on her and her husband's loan applications.  However, like many

16  Americans who took out subprime "liar" loans during the same time period, Ms. Moreno did not

17  anticipate the housing crash and at no time expected or wished for her family to go underwater on

18  their mortgages.[3]  Instead, Ms. Moreno engaged in the dishonest scheme because she wanted

19

20  ───────────────────────

21         [2]  Since the Probation Office has determined Count Thirteen (bank fraud conspiracy) has an
    adjusted offense level of 26 and has determined that Count One (tax fraud conspiracy) has an
22  adjusted offense level of 18, Count Thirteen's adjusted offense level is largely determinative of the Probation
    Office's ultimate sentencing recommendation, as Count One only results in a one-level increase to Ms.
23  Moreno's offense level under the "multiple count adjustment" calculations.  PSR at ¶¶ 28-43.
    Accordingly, the bank fraud conspiracy is discussed first and foremost.
24
25         [3]  The widespread practice of steering minority borrowers into subprime mortgages in the years
    leading up to the financial crisis has been the subject of numerous lawsuits and enforcement actions.  *See,*
26  *e.g.,* DOJ Press Release, *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than*
    *$175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), *available at*
27  http://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-
    million-relief; American Civil Liberties Union, "Justice Foreclosed: How Wall Street's Appetite for
    (footnote continued)
28

1  provide a place for her family to live safely and securely and sought to reap the newly found

2  financial stability her family was experiencing.  With the prodding assistance of mortgage brokers,

3  Ms. Moreno did what many did at that time in our history – wittingly made false statements to get

4  the loans while thinking that no harm would follow.[4]   Ms. Moreno admits that this was foolish,

5  stupid, greedy, and entirely her fault.

6  In retrospect, Ms. Moreno recognizes that the loans that her family had taken out were not

7  sustainable and her family's ability to stay afloat on the loans depended on home prices continuing

8  to climb.  They were over-extended and should never have tried to take on new homes.  Given her

9  limited education and understanding of real estate, however, Ms. Moreno failed to fully appreciate

10  the risk of taking on interest-only subprime loans during the quickly accelerating real estate

11  bubble.  Like the millions of Americans whose homes were foreclosed or short-sold, Ms. Moreno

12  did not intend or expect that she would be unable to pay her mortgage.[5]  The dynamic presented

13  by this historical and personal context provides a substantial basis for a downward variance from a

14  Guidelines sentence.  *See United States v. Monaco*, 23 F.3d 793, 799 (3d Cir. 1994) (explaining

15  that unanticipated proximate causes, such as a subsequent bankruptcy, may result in

16  "overstatement of criminality by the loss tables" and may warrant a sentence lower-than-

17  Guidelines sentence); *United States v. Redemann*, 295 F. Supp. 2d 887, 899 (E.W. Wis. 2003)

18  (explaining a below-Guidelines sentence may be warranted where "the amount of loss is the

19  product of several sources (e.g., an economic downturn, a market collapse, or negligence by the

20  _____

21

22  Subprime Mortgages Ended Up Hurting Black and Latino Communities" (October 2012), *available at* https://www.aclu.org/files/assets/justiceforclosed-singlepage-rel4.pdf.

23      [4] As far as the defense is aware, there has been no investigation of the role of the mortgage brokers

24  in the conspiracy, despite highly irregular and questionable business practices underlying the underwriting of the loans.

25      [5] From Q4 2007 to 2012, more than 500 California families lost their homes to foreclosure *every*

26  *day*.  *See* Center for Responsible Lending, "California Foreclosure Statistics: The Crisis is Not Over" (April 2012) at 1, *available at* http://www.responsiblelending.org/california/ca-mortgage/research-analysis/California-Foreclosure-Stats-April-2012.pdf.  Latinos accounted for 22% of all loans made between 2004

27  and 2008, but 37% of the foreclosures.  *Id* at 2.

28

victims), in addition to the defendant's conduct.") (citing *United States v. Rostoff*, 53 F.3d 398, 406-08 (1st Cir. 1995)).[6]

Although a sentence of 12 months and one day represents a significant downward variance from the Guidelines range, the Guidelines sentence for Ms. Moreno is based on fraud guideline § 2B1.1, which does not accurately reflect the nature and circumstances of her offense. As discussed, the *severity* of the financial loss suffered by the bank victims in this case were in large part due to financial factors outside Ms. Moreno's understanding and control and the requested sentence better reflects this.  Indeed, § 2B1.1 has been the subject of a crescendo of criticism in recent years for failing to appropriately take into account an individual defendant's culpability.  *See, e.g.,* Leah McGrath Goodman, *Nonsensical Sentences for White Collar Criminals*, Newsweek, June 26, 2014, *available at* http://www.newsweek.com/2014/07/04/ nonsensical-sentences-white-collar-criminals-256104.html.  Significantly, only half of sentences for financial fraud offenses in recent years fall within the recommended Guidelines ranges, as compared to 83.4% of sentences in 2003.  *Id.*

The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes (consisting of five professors, three federal judges, six practitioners, two organizational representatives, and observers from the DOJ and the Federal Defenders) has grappled with the problems posed by § 2B1.1 since April 2013 and recently issued a proposal on how § 2B1.1 might be revised to better take into account the culpability of an individual defendant and any victim impact.  *See* American Bar Association Criminal Justice Section, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (November 10, 2014), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.au thcheckdam.pdf.  Under the ABA Task Force's proposal, Ms. Moreno – a first time offender in

---

[6] Although the aforementioned cases arose in the context of downward departures, the same logic applies for a variance to a sentence lower than called for by the applicable Guidelines range.

1    Criminal History Category I – would likely be sentenced to an offense level of no greater than 10,

2    which corresponds to a Guidelines range of 6 to 12 months.  *Id*. at p. 10.

3         The spike in the base offense level to offense level 24 under § 2B1.1(b)(16)(D) – which

4    applies when a defendant received over $1 million in gross receipts – is just one example of how

5    the Guidelines are excessively punitive in this case.  *See* PSR ¶ 34.  The perverse way in which

6    strict adherence to § 2B1.1 plays out is not only a +2 enhancement (which Ms. Moreno agreed

7    should apply for Guidelines purposes) but also a spike to offense level 24 (which she did not agree

8    to and is not part of her plea agreement).[7]  Such punishment is excessive and does not reflect the

9    specific characteristics of Ms. Moreno's crimes.  While Ms. Moreno technically "received" over

10   $1 million in gross receipts in the sense that she and her husband were given mortgage loans to

11   purchase their family residences (Bayliss, then Hillview), the Guidelines contemplate treating their

12   receipt of these home loans to be of the same culpability as an individual who embezzled and

13   pocketed over $1 million.

14        Ms. Moreno's requested sentence also takes into account the nature and circumstances of

15   her role in the tax fraud conspiracy – which involved the same three family members as the

16   mortgage fraud:  Ms. Moreno, her husband, and her brother-in-law.  PSR ¶ 10.  As part of the

17   conspiracy, the defendants failed to report certain cash fares received by the family business

18   (Quality Assurance Travel) from bus passengers traveling to/from Chukchansi Casino in

19   Coarsegold, California.  *Id*. at ¶ 11.  Because these cash fares were not reported on the family

20   business' tax return, the defendants' income tax returns underreported their taxable income.  *Id*. at

21   ¶ 10.  Notably, however, although the unreported income was for tax years 2005, 2006, 2007,

22   2008, and 2009, Ms. Moreno did not begin working at Quality Assurance Travel until 2006 and

23   was out on maternity leave from December 2008 to February 2010.  *See* PSR ¶ 75; Dkt. No. 101 at

24

25        [7] Ms. Moreno's plea agreement with the government only applied the +2 level enhancement under
     this provision and did not apply the offense level spike to 24.  Dkt. No. 101 at p. 9.  It appears that in at

26   least two other recent cases in the Northern District, the Probation Office has recommended the +2
     enhancement under 2B1.1(b)(16)(D) without applying the offense level spike.  *See United States v. Besser*,

27   CR-12-875 WHA; *United States v. Nimer Anton Massis*, CR-13-666 EMC.

28

¶ 4.  This strongly suggests a scheme that, once started, continued without any involvement by Ms. Moreno.

Over the course of the five years of the conspiracy, the defendants' unsophisticated cash-skimming scheme resulted in unpaid taxes totaling $214,618 ($112,693 for Ms. Moreno and her husband's joint taxes and $101,925 for her brother-in-law's taxes).  *Id*. at ¶¶ 12-14.  The Morenos have fully accepted responsibility for their inexcusable failure to pay these taxes and worked hard to pay the restitution in full prior to pleading guilty in this case.  Dkt. No. 101 at 10.  As discussed further below, equivalent tax losses in similar cases have resulted in sentences far below the applicable Guidelines range and Ms. Moreno's requested sentence of 12 months and a day would best reflect the nature and circumstances of both the bank fraud conspiracy and the tax fraud conspiracy.

### 2.    The Requested Sentence Will Avoid Unwarranted Sentence Disparities.

Under § 3553(a), a sentencing court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Even after application of the Probation Office's suggested variance, the Probation Office's ultimate recommendation of a 37 month term of incarceration vastly exceeds sentences imposed on mortgage fraud defendants in our district, none of whom were individuals accused of mortgage fraud with respect to personal home loans or home loans for family members.[8]  For example:

- *United States v. Jacqueline Besser*, Case No. CR-12-875 WHA.  The defendant applied for a small business loan of $1.75 million and a $100,000 credit line but failed to disclose debt in applying for the loan and credit line.  The total loss was determined by the court to be $1,179,525.22.  Although the parties agreed the appropriate Guidelines range was 41-51 months, the sentencing judge varied downward under § 3553(a) to 3

---

[8] As previously described, the bank fraud conspiracy is largely determinative of the Guidelines range and the Probation Office's ultimate sentencing recommendation and is accordingly discussed first.

months custody (and 200 hours of community service and a requirement that the defendant give speeches about her offense to at least 100 people).

- *United States v. Jeanie Cusing*, Case No. CR-10-156 SI.  The defendant was a real estate professional who paid for forged documents and used those documents to assist borrowers to obtain mortgage loans.  The parties agreed the loss was between $200K and $400K.  The defendant was sentenced to 4 months custody.

- *United States v. Marilyn Infante*, Case No. CR-10-115 WHA.  The defendant was a loan officer at Washington Mutual who conspired with others to submit false information in support of mortgage loan applications to make applicants appear more qualified for loans than they were.  The loss as a result of the defendant's fraud was determined to be $595,678.65.  Prior to sentencing, the defendant also wired $345,000 to the Philippines without advising the Court, pretrial services, Probation, or the government.  The defendant was sentenced to one year and one day.

- *United States v. Hudson Rezende*, Case No. CR 10-0692 CRB.  Mr. Rezende solicited at least twenty false tax returns and/or verifications of bank deposits, then submitted them to mortgage lenders to obtain loans for his clients.  The parties agreed the loss amount was between $70K and $120K.  Mr. Rezende received a sentence of six months in prison.

- *United States v. Vera Santos & John Vieira*, Case No. CR-10-0300 WHA.  Ms. Santos was a licensed tax preparer who prepared several false tax returns for submission to mortgage lenders.  Mr. Vieira was a bank employee who prepared false verifications of deposit.  The sentencing court found a loss amount of $161,149.  Both defendants were sentenced to probation.

- *United States v. Judy Yeung*, Case No. CR-09-0376 SI.  The defendant was convicted at trial of conspiracy to commit wire fraud, eight counts of wire fraud, and three counts of witness tampering.  She engaged in a mortgage fraud conspiracy with two mortgage brokers to recruit straw buyers to submit applications for loans totaling more than $6.5

million.  Despite a loss calculation that produced an advisory sentencing range of 87 to 108 months, Ms. Yeung was sentenced to 24 months in prison.

Similarly, recent cases in our district have imposed sentences significantly lower than called for by the Guidelines in tax fraud cases as follows:

| Case | Docket No. | Judgment Date | Tax Loss | Term of Incarceration |
|------|-----------|---------------|----------|----------------------|
| *United States v. Desai* | CR-11-846 EJD | 7/7/2014 | $378,009 | 6 months |
| *United States v. Kenny* | CR-13-495 WHA | 2/11/2014 | $199,493 | 6 months |
| *United States v. Jiang* | CR-11-857 LHK | 10/23/2013 | $467,366 | 16 months |
| *United States v. McGrath* | CR-11-158 JSW | 10/4/2012 | $148,693 | 4 months |

Notably, each of the tax losses listed above were attributable to a single defendant; whereas, in the instant case, the $214,618 tax loss (all of which has since been repaid) is attributable to three defendants.

The requested sentence of 12 months and one day would be more consistent with the sentences handed down in similar cases and take into account Ms. Moreno's personal history and characteristics and the specific nature and circumstances of the offense.  An adoption of the Probation Office's recommended sentence of 37 months would still exceed the sentences meted out to defendants involved in far more complex fraud schemes with exponentially higher loss amounts.  *See, e.g., United States v. Waqar*, Case No. CR-11-464 PJH (defendant who defrauded his employer out of over $1.8 million by hiring fake employees and who failed to pay $142,530 in taxes sentenced to 33 months); *United States v. Aspillera*, Case No. CR-09-1102 SI (defendant who stole $1.77 million from her employer and failed to pay $644,843 in back taxes sentenced to 30 months).  In light of the substantial mitigating factors under § 3553(a), the Probation Office's recommended sentence would create a vastly unwarranted sentencing disparity.

### 3.     The Requested Sentence is Appropriate in Light of Ms. Moreno's History and Characteristics.

As noted by the Probation Office, Ms. Moreno's personal history is rife with mitigating factors.  PSR at ¶ 102.  Nonetheless, despite a difficult youth, Ms. Moreno has no criminal convictions, has been consistently employed for the last nineteen years, is a devoted wife, daughter, and mother of four, and has given back to her community by serving as a mentor in

1  Celebrate Recovery (a community and church-based 12 step program), teaching Sunday School at

2  her community church, and volunteering in her church's child care and outreach program.  PSR ¶¶

3  59-60, 62-63, 65, 74-78, 102; Exhibits C-R (letters of support).

4       Not only do Ms. Moreno's pastor, family members, coworkers, and friends universally

5  identify Ms. Moreno as an individual who is committed to serving her community, but they

6  describe a person who is a critical anchor for her children and extended family.  *See, e.g.*, Exhibit

7  C (Letter from James Moreno) ("My mom is making a difference in the community with her love.

8  A love that she credits God for giving her.  Her love not only has helped keep me emotionally

9  secure growing, but it has changed me so much that I want to love people the way she does.");

10  Exhibit D (Letter from Alma Morales) ("Elena is a wonderful wife, although her marriage was not

11  always perfect, she hung in there . . . She is a mother of four, a great mom who knows how to

12  discipline her children, doesn't over spoil them and keeps them on check.  Her children are very

13  well-behaved and extremely respectful."); Exhibit G (Letter from Cora Mancuso) ("[S]he is a very

14  loving woman who is very dedicated to her family, friends, work and church.  She will put others

15  first before herself."); Exhibit H (Letter from Erika Espericueta) ("Another good quality of my

16  aunt and uncle is that [they] are devoted parents, good parents.  They have always been there for

17  their kids and made sure they got the most out of life.  They have raised their kid to be a split

18  image of who they are.  All of her kids were raised to be kind, loving, and respectable people.

19  They have taught them good values of life.  Not only are they great parents to them but I consider

20  them to be my second parents."); Exhibit I (Letter from Gloria Bustos) ("I believe Eric and Elena

21  are very good parents and not only to their own children but to others as well.  I for one am

22  thankful for that.").

23       A lengthy term of incarceration will do little except to punish further Ms. Moreno's

24  dependents for Ms. Moreno's actions, which she deeply regrets.  Ms. Moreno's daughters (ages 5

25  and 11) and her elderly in-laws (ages 74 and 77), are fully dependent on Ms. Moreno and her

26  husband.  PSR ¶¶ 62, 102.  Ms. Moreno is the person who wakes them up in the morning, makes

27  their breakfast, attends teacher conferences, takes the young and old ones to doctor appointments,

28

1    makes sure their clothes are clean, homework is done and bedtime met.  Ms. Moreno's college-age

2    sons are also partially dependent on Ms. Moreno and her husband for support.  Her son James,

3    who will be the first one in the extended Moreno family to graduate from college, has been so

4    concerned about his family that he offered to drop out of school and come home.  Her other son,

5    Eddie Angel, did drop out in the midst of this family crisis despite Ms. Moreno's pleas that he stay

6    in school.  Her in-laws, now also her charges, have suffered health set-backs, including chronic

7    obstructive pulmonary disease and heart surgery and are even more reliant then they were before.

8    *See* PSR ¶ 62.  Compounding the potential disruption to Ms. Moreno's dependents is the fact that

9    her husband Fidencio is a codefendant and is facing significant prison time and potential

10   deportation.

11           In similar circumstances, courts have affirmed sentences of probation, home confinement,

12   or other alternative sentences so that the defendant can continue with his/her caretaking duties.

13   *See, e.g., United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming downward variance

14   to probation with 6 months community confinement); *United States v. Bueno*, 549 F.3d 1176,

15   1180-81 (8th Cir. 2008) (affirming downward departure from 37 to 46 month Guidelines range to

16   5 months home confinement due to medical condition of defendant's spouse); *United States v.*

17   *Menyweather*, 447 F.3d 625 (9th Cir. 2006) (affirming downward departure from Guidelines range

18   of 21 to 27 months to probation with 40 days of probation to be served on consecutive weekends

19   in a "jail-type institution"), *overruled on other grounds*, 621 F.3d 967 (9th Cir. 2010); *United*

20   *States v. Leon*, 341 F.3d 928, 932 (9th Cir. 2003) (affirming downward departure from 27 to 33

21   months to 8 months incarceration and 8 months home detention).

22           In recognition of the seriousness of her actions, Ms. Moreno is not seeking straight

23   probation or home confinement.  However, Ms. Moreno's respectfully submits that a sentence in

24   excess of 12 months and one day would cause unwarranted harm to her dependents with no

25   reciprocal benefit to society.  As detailed by her family plan (Exhibit A), the Morenos will call

26   upon on her sister-in-law (Arturo's wife) Delia to help take over the childcare and elder care duties

27   Ms. Moreno will be unable to handle while incarcerated.  Delia, however, has three young children

28

of her own (ages 1, 5, and 7) and is facing the reality of losing her own husband to incarceration. While Delia has done what everyone hopes a family member would do by stepping up to take on additional overwhelming responsibility, the reality is that it will be very difficult for Delia to take care of five children (ages 1, 5, 5, 7, and 11) as well as the elderly in-laws for longer than one year. The family's finances have been decimated by the costs of litigation and restitution payments so there is no money for hiring help or daycare. Even with Delia's care, Ms. Moreno's daughters, facing early adolescence, will suffer greatly and perhaps irreparably as a result of losing their mother to a lengthy prison term. The requested sentence, while not avoiding these devastating secondary harms, will go far in mitigating them while still fulfilling the sentencing objectives.

### 4. The Requested Sentence Will Provide Just Punishment and There is Little Risk That Ms. Moreno Will Reoffend.

Particularly because of the significant impact the criminal case has already had on her family and will continue to have on her family in the future, Ms. Moreno is exceedingly unlikely to reoffend. *See* 18 U.S.C. § 3553(a)(2)(A) & (C). Ms. Moreno's college-age children are deeply stressed and Ms. Moreno's marriage with her husband (and codefendant) is strained not only because of the impending incarceration of Ms. Moreno and her husband, but because of the shame that Ms. Moreno and her husband have experienced as they come to terms with the crimes they committed and inform their loved ones and community of their wrongdoings. Ms. Moreno is not only remorseful for her actions but has experienced deep anxiety over the impact that her and her husband's incarceration will have on her children. *See* Exhibit B (Letter from Elena Moreno); Exhibit D (Letter from Alma Morales); Exhibit F (Letter from Veronica Moreno-Castillo). Even without a prison sentence, Ms. Moreno's experience has served as a strong deterrent to any future criminal, or even reckless, behavior.

Despite her tumultuous youth, Ms. Moreno is a first time offender and has only two minor incidents in her criminal history (not convictions) from over 20 years ago when she was 18 years old and over 15 years ago when she was 25 years old. PSR ¶¶ 49-55. Ms. Moreno has no history of alcohol or drug abuse and has strong ties with her family and community. PSR ¶¶ 63, 66, 72. As reported by the United States Sentencing Commission, these traits make Ms. Moreno unlikely to be

recidivist.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), *available at* http://www.ussc.gov/ sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism _Criminal_History.pdf, at Ex. 9 (female Criminal History Category I offenders have a 10% recidivism rate and Criminal History Category I offenders with no drug use have a 10.8% recidivism rate) & Ex. 10 (Criminal History Category I offenders that are legally married have a 9.7% recidivism rate).  Likewise, the report illustrates that a sentence longer than 12 months will not have a meaningful impact on the likelihood of Ms. Moreno becoming a recidivist.  *Id.* at Ex. 12.

     **5.**     **The Requested Sentence Will Better Allow for Ms. Moreno to Provide Restitution to Victims of the Offense.**

As noted by the Probation Office, Ms. Moreno has paid in full the restitution for the tax fraud conspiracy (Count One).  Currently outstanding is the restitution this Court determines Ms. Moreno must pay Wells Fargo Bank and NationStar Mortgage.  Probation has determined that the restitution owed is $219,000.  Especially in light of the fact that Ms. Moreno's husband is a codefendant who has entered into an 11(c)(1)(C) plea agreement with the government for 41 months of imprisonment (and may be subject to deportation after he serves his term of incarceration), the Probation Office's assessment of Ms. Moreno's ability to pay (PSR ¶¶ 79-80) is only accurate insofar as it summarizes Ms. Moreno and her husband's positive monthly cash flow for when both Ms. Moreno and her husband are out of custody.  A longer term of imprisonment for Ms. Moreno will inevitably delay her ability to pay restitution, as Ms. Moreno will be unable to work during incarceration and may incur significant childcare costs during her incarceration if her request for staggered sentences is not granted or if her term of incarceration is so long that her sister-in-law Delia cannot assist with childcare for the whole period of incarceration.

**C.**     **Objections to Presentence Report.**

     **1.**     **There is No Basis to Apply a Manager/Supervisor Enhancement.**

The draft presentence report did not apply a manager/supervisor enhancement to Ms. Moreno.  Nonetheless, the Probation Office changed course for the final presentence report and decided to apply a manager/supervisor enhancement to Ms. Moreno with respect to Count

1  Thirteen (bank fraud conspiracy).  The sole basis for this enhancement is the government's

2  contention that Ms. Moreno somehow supervised employees of MJ Consulting, Inc. – uncharged

3  individuals who were hired by Ms. Moreno's husband's lawyer to assist them with avoiding

4  foreclosure through loan modification.  Despite the fact that the records provided by the

5  government do not support a finding that Ms. Moreno managed or supervised the MJ Consulting

6  employees, the presentence report adopts the government's unsupported contentions wholesale.

7  This is factually wrong and legally unsupportable.  *See* PSR at ¶¶ 19, 37.

8        As the Ninth Circuit has observed, "conduct which may have been integral to the success

9  of the criminal enterprise, or conduct that reflects a high degree of culpability [is] insufficient to

10  support a leadership enhancement . . . ."  *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir.

11  2012).  To apply a manager/supervisor enhancement, there must be "evidence that the defendant

12  exercised some control over others involved in the commission of the offense [or was] responsible

13  for organizing others for the purpose of carrying out the crime."  *Id*. at 975 n.6.  There is no such

14  evidence here.

15        As described previously, the conspiracy at issue for Count Thirteen involved three

16  immediate family members who obtained home loans to purchase homes for themselves and Ms.

17  Moreno's mother in law.  The loans at issue were taken out from 2005 to 2007.  When the

18  Morenos fell behind on their home loan payments, Ms. Moreno's husband sought the assistance of

19  the Yesk Law Group/MJ Consulting Services Inc. (hereinafter "MJ Consulting").  As the MJ

20  Consulting records provided by the government indicate, MJ Consulting has "extensive

21  experience in loan origination and the foreclosure and securitization process" and "based on the

22  knowledge [it] acquired over the past several years" would assist to "prosecute and defendant any

23  anticipated legal matters" for its clients.  Further, the Litigation Support Consulting Agreements

24  between Ms. Moreno's husband and MJ Consulting specify that MJ Consulting would work

25  "under the supervision of our legal counsel Michael Yesk (attorney at law)."  A simple PACER

26  search reveals that since 2012, Attorney Yesk has filed over 70 federal cases against lenders and

27  mortgage companies in the Northern District of California alone.  The assertion that Ms. Moreno –

28

1   who dropped out of high school and who had no prior experience with loan modification –

2   somehow usurped Attorney Yesk's role as a supervisor and managed and supervised the

3   experienced professionals at MJ Consulting is absurd.

4         At most, Ms. Moreno served in a secretarial capacity and retrieved documents as directed

5   by MJ Consulting.  Although the government and the Probation Office make much of Ms. Moreno

6   being the "primary contact" between MJ Consulting and the codefendants (Ms. Moreno's husband

7   and brother-in-law), the records at most show that Ms. Moreno was the "primary contact" for

8   communications directed to herself and her husband.  Not only is this division of labor between

9   husband and wife meaningless for obvious reasons, but it is largely explained by Ms. Moreno's

10  regular access to a computer and phone during business hours (due to her office job) in contrast to

11  her husband's lack of such regular access (due to his job in the bus lot).  Further, although the

12  Probation Office adopts (verbatim) the government's contention that Ms. Moreno was

13  "responsible for managing the submission of documents supporting the fraudulent loan

14  modification applications," the evidence at best suggests that some (but not all) requests for

15  documents were directed by MJ Consulting to Ms. Moreno and that Ms. Moreno would provide

16  documents as directed.  This is consistent with Ms. Moreno's secretarial job responsibilities and

17  her additional role as the primary housekeeper and homemaker.  The notes clearly show that

18  employees at MJ Consulting – the experts in loan modification and foreclosure defense – were

19  responsible for determining which documents were needed and for synthesizing the raw materials

20  obtained from the Morenos into the loan modification applications that were eventually submitted.

21        In addition to the fact that the government cannot show that Ms. Moreno supervised,

22  managed, or had any control over the employees of MJ Consulting, there is insufficient evidence

23  that anyone at MJ Consulting can even be considered a "participant" for purposes of § 3B1.1 in

24  the first instance.  Application Note 1 to Section 3B1.1 specifies a "participant" is "a person who

25  is *criminally responsible* for commission of the offense, but need not have been

26  convicted" (emphasis added).  The records relied upon by the government and by the Probation

27  Office do not even identify *who* at MJ Consulting took the notes that are being characterized as

28

"evidence" (and it appears there were multiple note takers) so the name and job title of the employee who supposedly took the notes remains a mystery.  As such, the unidentified employee cannot be considered to be a criminal participant and no enhancement can be applied.  *See, e.g., United States v. Brown*, 771 F.3d 1149 (9th Cir. 2014) (reversing application of leadership enhancement where it was not clear that defendant had controlled a particular "criminally responsible" individual); *United States v. Luca*, 183 F.3d 1018, 1024 (9th Cir. 1999) ("Unknown facilitators of crimes will not be considered criminally responsible participants.")

Furthermore, even assuming that the government's translations of the records relied upon are correct, the records cited by the government have still not been shown to be reliable evidence.  We do not know who wrote the notes at issue, we do not know when the notes were written in relation to when the alleged conversations occurred, and we do not know if we can rely upon the note taker's account of what was said – especially since the notes provide no context for the statements attributed to Ms. Moreno.  Such unreliable evidence cannot be the basis to enhance Ms. Moreno's criminal liability so significantly.  More importantly, even assuming that the statements relied upon by the Probation Office and the government for the enhancement are accurate, they do not suffice to find that Ms. Moreno exercised any control over MJ Consulting or that any specific individual at MJ Consulting can be found to be a participant criminally responsible for the commission of Count Thirteen.

**2.      There is No Basis for the Presentence Report's Speculation that Ms. Moreno Has Had "Anger Management Issues."**

The Probation Office contends that an aggravating factor for the Court to consider is Ms. Moreno's "other criminal conduct might suggest that there was at least the possibility of underlying anger management issues in the past."  Beyond being insensitive to the history of domestic violence Ms. Moreno described during her presentence interview, this conclusion is based solely on a 1999 arrest of Ms. Moreno for an altercation with her husband.  PSR at ¶ 53.  There is no evidence that this incident occurred as described by the presentence report and is complicated by the fact that it occurred during a time when Ms. Moreno's husband was abusive and suffered from severe addiction.  *Id*. at ¶¶ 62, 102.  To saddle Ms. Moreno with this

unsupported conclusion is unfair.  That said, Ms. Moreno has always been amenable to counseling and mental health treatment and is the first to acknowledge that depression and despondency arising from the events following this case have caused her to not take care of herself as she knows she should.  While she has turned to counselors in her church community, she would welcome any mental health treatment that the court would impose as part of her sentence.

> **3.      There Has Been an Insufficient Showing that Forfeiture, in Addition to Restitution, is Appropriate.**

The presentence report recommends that the "defendant's interest" in at least $3,328,600 in U.S. currency (presumably representing the value of <u>all</u> home loans that were part of the bank fraud conspiracy), her family's current residence (Hillview), her mother-in-law's former home (Chesbro), and her brother-in-law's home (Cadiz) be forfeited to the United States.  However, the presentence report's recommendation appears to simply copy the government's forfeiture allegations as contained in the superseding indictment and does not specify or quantify what "interest" Ms. Moreno has in the enumerated properties.  This is particularly problematic given that Ms. Moreno has no property interest in Chesbro or Cadiz or the loans that were issued to purchase those properties.  Further, the $3,328,600 figure appears to encompass the value of loans for homes that have already been foreclosed on or short-sold – for which the presentence report already recommends that Ms. Moreno be required to pay restitution.  Finally, all loans that are the subject of the bank fraud conspiracy were interest-only loans – so it is unclear what "interest," if any, was obtained by any of the defendants in the loans.  As it stands, the government has not made the requisite showing for this Court to order any forfeiture of property beyond what is encompassed by the Court's restitution order.

## IV. CONCLUSION

For the reasons stated herein, the Court is respectfully urged to implement a downward variance under § 3553(a) and sentence Ms. Moreno to a term of imprisonment no greater than twelve months and a day, to be served consecutively and staggered with her codefendant husband Fidencio Moreno and brother-in-law Arturo Moreno.  Ms. Moreno also respectfully requests that her aforementioned objections to the presentence report be sustained.

Dated:  January 14, 2015.                          Respectfully submitted,

CLARENCE DYER & COHEN LLP


By: _____/s/ Nanci L. Clarence_____
       Nanci L. Clarence
       Gina Moon

Attorneys for Defendant Elena Moreno