MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

THOMAS MOORE (ALBN 4305-O78T)
Assistant United States Attorney
Chief, Tax Division

KATHERINE L. WONG (CABN 264056)
Assistant United States Attorney
Eastern District of Virginia

TODD P. KOSTYSHAK (NCBN 39830)
Trial Attorney
U.S. Department of Justice, Tax Division

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (202) 514-5145
FAX: (415) 436-7009
Todd.P.Kostyshak@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | NO. 12-CR-750-LHK |
|---|---|---|
| Plaintiff, | ) ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| v. | ) ) | |
| ELENA MORENO, | ) ) | Sentencing Hearing: January 21, 2015 at 9:30 am |
| Defendants. | ) ) ) | |

The United States, by and through Melinda Haag, United States Attorney, and the undersigned

attorneys, hereby submits its memorandum regarding the sentencing of Defendant Elena Moreno

(hereinafter "the Defendant" or "Defendant Elena Moreno").

The Presentence Investigation Report ("PSR") determined that the total offense level was 24 and

GOVERNMENT'S SENTENCING MEMORANDUM
12-CR-750-LHK

the criminal history category was I.  The corresponding Guidelines' range is 51 to 63 months'

imprisonment.  *See* PSR ¶¶ 27-47.  The United States agrees with the PSR's recitation of the relevant

facts, except as otherwise noted.  Aside from a mathematical issue regarding the calculation of loss for

Count 13, the United States also agrees with the PSR's calculation of the sentencing Guidelines' range.

The United States does not, however, agree with the PSR's calculation of restitution.

For the reasons set forth in detail below, the Government recommends that the Court impose a

sentence of 33 to 37 months' imprisonment.  The Government further requests that the Court order

restitution to the financial institutions, which include Wells Fargo and NationStar Mortgage.  The

Government reserves the right to supplement this memorandum with testimony and argument at the

sentencing hearing.

## I.      BACKGROUND

The government incorporates the factual background in the PSR and Defendant Elena Moreno's

plea agreement.

A federal grand jury sitting in the Northern District of California originally returned an

indictment against the Defendant Elena Moreno and Defendants Arturo and Fidencio Moreno in October

2012.  [ECF No. 1]  This indictment charged all of the defendants with conspiracy to defraud the United

States, in violation of 18 U.S.C. § 371.  The defendants were also charged with filing false tax returns, in

violation of 26 U.S.C. § 7206(1).

In January 2014, a federal grand jury returned a superseding indictment against Defendants

Elena, Fidencio, and Arturo Moreno.  [ECF No. 64]  In addition to the charges in the original

indictment, the superseding indictment charged all of the defendants with conspiracy to commit bank

fraud and wire fraud, in violation of 18 U.S.C. § 1349.  Defendants Elena and Fidencio Moreno were

*GOVERNMENT'S SENTENCING MEMORANDUM*
*CR 12-750-LHK*
2

also charged with making false statements on loan applications that were submitted to various financial institutions, in violation of 18 U.S.C. § 1014.  *Id.*

On August 20, 2014, the Defendant pled guilty to Counts 1 and 13 of the superseding indictment, which charged her with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and conspiracy to commit bank fraud and wire fraud, in violation of 18 U.S.C. § 1349.  [ECF No. 100, 101]

As set forth in the Defendant's plea agreement, the conduct underlying Count 1 centers upon the failure of the Defendant and her coconspirators, Fidencio Moreno ("Fidencio") and Arturo Moreno ("Arturo") to report all of the gross receipts for a charter bus company known as Quality Assurance Travel ("QAT").  [ECF No. 101]  Much of the unreported income for QAT were cash receipts from customers, which were earned and paid in conjunction with QAT's contract with the Chuckchansi Gold Resort and Casino located in Coarsegold, California.  The conspiracy lasted from at least 2005 through July 2010, when special agents from the Criminal Investigation division of the Internal Revenue Service ("IRS-CI") executed a search warrant on QAT's offices in San Jose, California.

During the conspiracy, Defendant Elena Moreno was married to Fidencio, one of the two co-owners of QAT.  Defendant Elena Moreno also worked as an employee of QAT.  Her duties included making entries into the books and records for QAT, including QuickBooks.  The Defendant also made deposits into the QAT business bank account, and provided information to the accounting firm that prepared the federal income tax returns for QAT, a subchapter S Corporation, and the personal income tax return for Defendants Arturo, Fidencio and Elena Moreno.  PSR ¶¶ 9-11, 75.  Defendant Elena Moreno, along with her coconspirators, falsely told the accounting firm that the records provided for QAT and for preparation of their personal returns were accurate, when in fact she knew that these records intentionally failed to include a substantial amount of gross receipts from QAT.  As a result, the individual income tax returns for the Defendant and her coconspirators were false, in that they

substantially underreported their income and consequently the taxes due on that income.  For tax years 2005 through 2009, the total amount of unreported gross receipts exceeded $966,908.  The total tax loss caused by the conspiracy was $214,618.

With respect to Count 13, the conspiracy to commit wire fraud and mail fraud began in at least 2005 and continued through at least July 2013.  PSR ¶¶ 15-22.  During that time period, Defendant Elena Moreno and her coconspirators, Fidencio and Arturo, caused false and fraudulent loan applications to be submitted to various financial institutions, including Wells Fargo Bank, Washington Mutual Bank, Lehman Brothers Bank FSB, First Franklin Financial Corporation, NationStar Mortgage, and National City Bank.

Based on these false and fraudulent loan applications, Defendant Elena Moreno and her coconspirators were approved for home mortgages and home equity lines of credit, which were used to purchase and/or refinance real property located in and around San Jose, California.  These properties included 5832 Cadiz Drive ("Cadiz"), 5839 Chesbro Avenue ("Chesbro"), 7535 Bayliss Place ("Bayliss"), and 5937 Hillview Ave ("Hillview").

These applications were false and fraudulent because they overstated the assets and income of the applicant(s).  Some of the applications, such as the applications for Chesbro and for the refinance of Bayliss, also falsely stated that the applicant intended to occupy the property as his/her primary residence.  As part of and in furtherance of the conspiracy, Defendant Elena Moreno submitted an application for a $111,600 home equity line of credit on Bayliss, in which she made false claims regarding her employment, assets, and income.  *See* Ex. 1, at 1-2.  That same month, she and Fidencio, her husband and coconspirator, had submitted a false and fraudulent loan application to Washington Mutual Bank for the purchase of obtaining a loan to purchase Hillview, in which they overstated their income and assets, and understated their liabilities.

In 2011, the conspiracy continued when the defendants fell behind on their mortgage payments for the four properties that they had purchased and/or refinanced using fraudulently-obtained loans. Ex. 2, at 1-2, 16-25.  In an attempt to avoid foreclosure, Defendant Elena Moreno and her coconspirators agreed to seek to modify the terms and conditions of the loans on the properties.  With the assistance of a company known as MJ Consulting, Defendant Elena Moreno and her codefendants submitted false and fraudulent loan modification applications, which understated their income and assets.  *See* Ex. 3 (example documents submitted to NationStar); *compare id.* at 11-13 to Ex. 4 (documents submitted to tax return preparer).

Defendant Elena Moreno and her codefendants also submitted false and fraudulent supporting documentation, including statements regarding the amount of rental income that they were purportedly receiving from some of the properties. Ex. 3, at 15-20.  Documents obtained from MJ Consulting show that Defendant Elena Moreno coordinated, provided, and caused to be provided the false and fraudulent documents submitted to the financial institutions in support of the loan modification requests. EX. 5, at 39-76.  Documents obtained from MJ Consulting show that the conspiracy was successful, with two of the financial institutions approving loan modifications requests based on the false and fraudulent applications.  Ex. 2, at 4-14, 26-32. The loan modifications were approved for the Hillview and Cadiz properties in September and June 2013, respectively.  *Id.*

As a result of the false and fraudulent modification requests, the financial institutions reduced the principal balances on the loans on Cadiz and Hillview by $39,627.60 and $53,576.08, respectively.  *Id.*; *see also* Ex. 5, at 65-66, 69-74.  This loss was borne by the financial institutions, Bank of America for Cadiz and Wells Fargo Bank for Hillview.  The beneficiaries of this fraud were Defendant Elena Moreno and her coconspirators, Fidencio and Arturo.  In addition to reducing the mortgage principal due to these fraudulent loan applications, the financial institutions also reduced the monthly payments on the

mortgages for Hillview and Cadiz.  Ex. 2, at 4-14, 26-36.  To date, Defendant Elena Moreno and

Fidencio are still living in Hillview, while their coconspirator Arturo continues to reside in Chesbro.

Bayliss was sold via short sale in August 2013, causing a loss to Wells Fargo bank.[1]  Chesbro

was foreclosed by NationStar Mortgage in May 2014, resulting in a loss to NationStar Mortgage.[2]  The

losses to both financial institutions include past-due mortgage interest and costs associated with the

foreclosure, including legal fees incurred when Defendants Elena Moreno and her coconspirator,

Fidencio, filed for bankruptcy.  All of the bankruptcy filings were dismissed for failure to file the

required schedules.  The bankruptcy filings did, however, have the effect of delaying the foreclosures of

these properties, which were pending at the time the bankruptcy petitions were filed.

### a.  Objections to the PSR

The government hereby makes the following objections to the PSR, and respectfully requests

that the following corrections be made.

#### i.  *Count 13 – Loss Calculations*

**Bayliss loss calculations (2013 short sale):** The PSR incorrectly states that the loss to Wells

Fargo for the purpose of Guidelines calculations from the short sale of Bayliss was only $96,000.  PSR ¶

20.  This calculation is incorrect, however, and should be changed as follows:  With regards to the loss

calculations under the Guidelines, the PSR errs in calculating loss by subtracting the unpaid principal on

the Wells Fargo loan, $521,000, from the total sales price $425,000 shown on the HUD-1.  This

calculation is incorrect because, as shown on the HUD-1, not all of the $425,000 went to Wells Fargo

bank.  Rather, a significant portion of the $425,000 was paid to third parties, such as the real estate

agents and the title company.  The actual loss to Wells Fargo, excluding interest, is shown on the

---

[1] The government objects to the PSR's loss calculations and restitution amounts for the Bayliss property as detailed *infra.*

[2] The government objects to the PSR's loss calculations and restitution amounts for the Chesbro property, as detailed *infra.*

attached Exhibit 6.  Exhibit 6 shows the realized loss calculations performed by Wells Fargo Bank; Exhibit 6 is a certified business record.  To determine the loss for the purposes of calculating the Defendant's Guidelines range, the PSR should have used the total expenses of $595,998.78 (line 19 on Ex. 6), less interest of $58,558.19 (line 2 on Ex. 6), which is excludable under § 2B1.1 cmt. 3(D)(i), less the proceeds that Wells Fargo bank actually *received* from the sale of the property, $392,439.19 (line 25 on Ex. 6).  The total loss to Wells Fargo Bank should thus be $145,001.38 ($595,998.78-$58,558.19-$392,439.19).  The sales price of $425,000 is not relevant here and should not be used in the calculation.  Rather, the $392,439.19 should be used under § 2B1.1. because it reflects what the victim, Wells Fargo Bank, actually recovered by the time of the Defendant's sentencing, from the disposition of the collateral.  *See* § 2B1.1 cmt. 3(E)(ii).

**Chesbro forgiveness of indebtedness (2012):** In 2012, Wells Fargo Bank forgave a separate home equity line of credit valued at $33,578.35.  This home equity line of credit was associated with the Chesbro property.  When the loan was forgiven, the loss that borne by Wells Fargo Bank and the defendant made no further repayments.  The loss from the line of credit is shown at Exhibit 8.  As shown by the date of the Form 1099-C issued by Wells Fargo Bank, this home equity line of credit was obtained and then terminated long before Chesbro was foreclosed upon by NationStar Mortgage in 2014.  Accordingly, this 2012 home equity line of credit is separate and apart from the loss caused to NationStar Mortgage when it foreclosed on Chesbro in 2014 and was never, to the government's knowledge, recouped by Wells Fargo in any way.  *See* Ex. 9.  The PSR should not omit this loss to Wells Fargo from the statement of facts, loss calculations for the purposes of determining the Guidelines range, and restitution determination; these errors should be corrected.  *See* PSR ¶¶ 21, 94, 34.  The government respectfully requests that the amount of the home equity line of credit that Wells Fargo forgave in 2012 as to Chesbro be included in the loss calculations, with the amount equal to $33,578.35.

**Chesbro loss calculations (2014 foreclosure by NationStar):** The PSR incorrectly states that the loss to NationStar mortgage for the purpose of Guidelines calculations from the foreclosure of Chesbro in 2014 was only $123,000.  PSR ¶ 21.  This calculation is incorrect, however, and should be changed as follows:  With regards to the loss calculations under the Guidelines, the PSR errs in calculating loss by subtracting the unpaid principal on the NationStar loan, $533,600, from the raw sales price $544,000 shown on the HUD-1.  This calculation is incorrect because, as shown on the HUD-1, not all of the $544,000 went to NationStar mortgage.  Rather, a significant portion of the $544,000 was paid to third parties, such as the real estate agents and the title company.  Of the sales price for the foreclosure, NationStar only received $485,161.29.  The actual loss to NationStar mortgage, excluding interest, is shown on the attached Exhibit 9.  Exhibit 9 shows the realized loss calculations performed by NationStar Mortgage; Exhibit 9 is a certified business record.  To determine the loss for the purposes of calculating the Defendant's Guidelines range, the PSR should have used the total expenses of $686,024.07 (Ex. 6, at 2), less $119,504.31 of interest, which is excludible under § 2B1.1 cmt. 3(D)(i), less the proceeds that NationStar mortgage actually *received* from the sale of the property, which is $485,161.29 (Ex. 6, at 1).  Accordingly, the total loss to NationStar mortgage should be $81,358.47 ($686,024.07-$119,504.31-$485,161.29).  The sales price of $544,000 is not relevant here, because the $485,161.29 reflects what the victim, NationStar, actually recovered by the time of the sentencing from the disposition of the collateral (house).  *See* § 2B1.1 cmt. 3(E)(ii).

Thus, the total loss for the purposes of determining the Guidelines' range under § 2B1.1 is $259,938.20.  The PSR should be corrected to reflect this amount.  *See* PSR ¶ 22.

ii.  *Count 13 – Restitution Calculations*

**Bayliss restitution calculations (2013 short sale):** The PSR incorrectly states that the restitution amount owed to Wells Fargo for losses sustained due to the Bayliss short sale is equal to the loss amount

calculated under U.S.S.G. § 2B1.1, and is thus limited to $96,000.  PSR ¶¶ 20, 94.  The PSR errs in not including prejudgment interest in the restitution owed to Wells Fargo for the fraud regarding this property.

The Ninth Circuit has expressly held that restitution for financial institutions that are the victims of bank or wire fraud is calculated differently than the "loss" amount under U.S.S.G. § 2B1.1.  *See United States v. Morgan*, 376 F.3d 1002, 1014 (9th Cir. 2004) (holding "loss" for restitution purposes can include interest and finances charges because they "directly result" from a defendant's conviction for bank or wire fraud, where the underlying conduct is making false statements on a loan application); *see also United States v. Catherine*, 55 F.3d 1462, 1465 (9th Cir. 1995).  Under 18 U.S.C. § 3663A, however, restitution is permitted for all losses "directly resulting from the defendant's offense."  *Morgan*, 376 F.3d at 1014.  The amount is the *actual* loss to the financial institution, which "can include prejudgment interest," as well as contractual interest and finance charges.  *Id.*

Accordingly, the restitution amount in the PSR that is payable to Wells Fargo for the Bayliss short sale should be corrected to include the prejudgment, contractual interest that the Defendant and her coconspirators owed, and failed to pay, to Wells Fargo bank before the short sale.  PSR ¶ 94.  The total restitution owed to Wells Fargo bank for the Bayliss property is $203,559.59 (line 37 on Exhibit 6).  This amount is the difference between the total cost incurred by Wells Fargo related to the short sale ($595,998.78), less the amount that Wells Fargo received from the sale ($392,439.19).  Ex. 6.

**Chesbro forgiveness of indebtedness restitution (2012):**  As described above, Wells Fargo bank forgave a home equity loan line of credit as to Chesbro in 2012.  Ex. 8.  The total amount of debt that was forgive was $33,578.35.  This debt was not recouped by Wells Fargo when Chesbro was foreclosed in 2014, because Wells Fargo had already forgiven and written off the debt in 2012, years before.  Because Wells Fargo never received any collateral or repayment for this line of credit, the PSR

should be changed to include the amount of this home equity loan line of credit, $33,578.35, as restitution owed to Wells Fargo.

Considering both properties, the total restitution owed to Wells Fargo is $237,137.94.

**Chesbro restitution calculations (2014 foreclosure):** The PSR incorrectly states that the restitution amount payable to NationStar Mortgage for losses due to the Chesbro foreclosure in 2014 is equal to the loss amount calculated under U.S.S.G. § 2B1.1, and is limited to $123,000, at most.  PSR ¶¶ 21, 94.  The PSR errs by not including prejudgment interest in the amount to be paid to NationStar Mortgage for foreclosure of this property, which are permitted and proper for the same reasons explained above regarding the Bayliss property.  *See Morgan*, 376 F.3d at 1014; *Catherine*, 55 F.3d at 1465.

The restitution amount in the PSR that is payable to NationStar for the Chesbro foreclosure should be corrected to include the prejudgment interest ($119,504.31) that the Defendant and her coconspirators owed, and failed to pay, to Wells Fargo bank before the short sale.  PSR ¶ 94.  The restitution amount owed to NationStar for Chesbro property is thus $202,597.28 (Ex. 9, at 1-2).  This is the difference between the total costs incurred by NationStar due to the foreclosure and subsequent sale ($686,024.07), less the amount that NationStar received from the sale ($485,161.29).  Ex. 9.

The total amount of restitution that the government is requesting is: $202,597.28 to NationStar Mortgage and $237,137.94 to Wells Fargo Bank.

## II.     APPLICABLE LAW

Under *United States v. Booker*, 543 U.S. 220 (2005), the U.S. Sentencing Guidelines are no longer mandatory.  Rather, the "overarching statutory charge" is to "impose a sentence sufficient, but not greater than necessary" to reflect the factors set forth in 18 U.S.C. § 3553(a)(2), including the seriousness of the offense; the need to promote respect for the law and provide just punishment; to

afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a); *United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008) (en banc).

After *Booker*, sentencing proceedings should begin by determining the applicable Guidelines range. *Carty*, 520 F.3d at 991. Although the Guidelines are no longer mandatory, the Guidelines range can and should be considered "the starting point and the initial benchmark" and is "to be kept in mind throughout the process." *Id.* (quoting *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) and *Gall v. United States*, 552 U.S. 38, 49 n.6 (2007)). After determining the Guidelines' range, the Court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. In doing so, the Court may not presume that the Guidelines range is reasonable, nor give the Guidelines range more or less weight than any other factor. If the Court decides that a sentence outside of the applicable Guidelines' range is warranted, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree to which the sentence is outside the applicable range. In pronouncing a sentence, the Court must explain the sentence it selects sufficiently so as to permit meaningful appellate review.

What constitutes a "sufficient explanation," will necessarily depend on the complexity of the case and whether the chosen sentence is inside or outside of the Guidelines. A within-Guidelines sentence "ordinarily" requires little explanation, unless specific departures have been requested, a difference sentence has been sought, or the Guidelines calculation itself has been challenged. *Carty*, 520 F.3d at 991.

## III. DISCUSSION

### a. Guidelines' Calculations

#### i. *Count 1 – Conspiracy to Defraud the United States*

The Government agrees with the probation officer's application of §§ 2T1.1-2T1.9 of the U.S. Sentencing Guidelines to determine the base offense level for Count 1. The total tax loss is $214,618 for tax years 2005 through 2009, which corresponds to an offense level of 18. U.S.S.G. § 2T1.4(H). In this case, no specific offense or victim-related adjustments apply. Similarly, the Government agrees with the PSR that there should be no adjustment based on Defendant Elena Moreno's role in the offense. PSR ¶¶ 28-33. The evidence shows that Defendant Elena Moreno assisted with the bookkeeping for QAT during the course of the conspiracy. Records obtained during the search of QAT also show that she assisted with counting the unreported cash receipts earned by the business, and assisted with bank reconciliations. *See* Ex. 7. The Defendant was also involved in providing records to the accounting firm, which failed to include the unreported business receipts. The Defendant's role establishes not only her knowledge, but involvement in the central steps necessary to carry out and further the conspiracy to defraud the United States. The evidence also shows that the Defendant personally benefited from the cash receipts, which the she and her coconspirators used in part to pay for personal living expenses.

*ii.   Count 13 - Conspiracy to Commit Wire Fraud and Mail Fraud*

**Base Offense Level:** The Government agrees with the PSR and the probation officer's determination that §2B1.1(b)(16)(D) applies to this case, and thus determines the base offense level under § 2X1.1. PSR ¶ 34. In relevant part, § 2B1.1(b)(16)(D) provides that if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense…if the resulting offense level is less than level 24, increase to level 24." Here, the Defendant and her coconspirators derived approximately $2,118,000 from different financial institutions, including Washington Mutual, Wells Fargo Bank, National City Bank, Lehman Brothers, and NationStar Mortgage. [ECF No. 101] Because § 2B1.1(b)(16)(D) applies and the Guidelines calculation must be

accurate so that the Court can have the correct starting point for a sentencing decision,, the Court should find that the base offense level is 24.[3]

**Leader/Organizer enhancement:** The Government agrees with the PSR that the offense level for Count 13 should be increased by two levels, pursuant to U.S.S.G. § 3B1.1(c), based on Elena's role and actions as a manager, supervisor, organizer, or leader, of the bank and wire fraud conspiracy.  PSR ¶¶ 37, 19.  Section 3B1.1(c) of the U.S. Sentencing Guidelines provides for a 2-level increase to the offense level if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in §3B1.1(a) or (b). [4]

The agreed-upon facts regarding that bank and wire fraud conspiracy are set forth in the Defendant's plea agreement. [ECF No. 101, at 5-7]  As relevant here, Defendant Elena Moreno admitted that there was an agreement among the coconspirators to submit false applications and documentation to the financial institutions in support of their loan modification requests. As part of the conspiracy, the Defendant and her coconspirators hired MJ Consulting to assist them in submitting the modification applications to the lenders.

Since the entry of Defendant Elena Moreno's plea, the government has obtained additional records from the company that assisted with the submission of the false and fraudulent loan applications,

---

[3] Although the total offense level for Count 13 is 24, the Government respectfully requests that the Court impose a sentence that is consistent with the calculations contemplated in Defendant Elena Moreno's plea agreement, which had initially calculated the offense level for Count 13 as 21 or 23, because it mistakenly did not account for the applicability of §2B1.1(b)(16)(D).  For a total offense level of 21 or 23, the low end of the Guidelines' range is 33 to 37 months' imprisonment.  The Government believes that this downward variance properly and correctly accounts for the different factors under § 3553(a), including the various mitigation factors identified in the PSR and in this sentencing memorandum.

[4] The United States Sentencing Commission Aggravating and Mitigating Role Adjustments Primer §§3B1.1 and 3B1.2 clarifies the issues through advisory commentary.  *See* U.S. Sentencing Commission, Primer Role Adjustment, *available at* http://www.ussc.gov/sites/default/files/pdf/training/primers/Primer_Role_Adjustment.pdf.

*GOVERNMENT'S SENTENCING MEMORANDUM*
*CR 12-750-LHK*

MJ Consulting.  Documents obtained from MJ Consulting confirm that Elena was the primary contact between MJ Consulting and other members of the conspiracy. *See* Ex. 5.  The evidence, particularly documentation obtained from MJ Consulting, shows that Elena directed other participants, including the employees of MJ Consulting, in furtherance of the goals of the conspiracy. She also organized and managed the submission of documents on behalf of herself and her coconspirators, with the assistance of MJ Consulting.  Her role in these two capacities each independently supports a two-level enhancement under U.S.S.G. § 3B1.1.

Although not co-conspirators, the employees of MJ Consulting constitute "participants" within the meaning of § 3B1.1(c). According to the Adjustments Primer for the U.S. Sentencing Guidelines, "[c]ourts 'uniformly count' as participants those who 'were (i) aware of the criminal objective, and (ii) knowingly offered their assistance.'" (*quoting United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002)). The *Primer* further clarifies that "the definition of 'participant' is broader than conspiratorial liability." *Id.* at 2.  The *Primer* also notes that "the defendant, as a criminally responsible person, *is* a participant for purposes of counting the number of participants under §3B1.1." (*citing United States v. Paccione*, 202 F.3d 622, 625 (2nd Cir. 2000)(emphasis in original)).  *Primer* at 2.  Here, the evidence shows that Defendant Elena Moreno coordinated the conspiracy's response during the pendency of the fraudulent loan modification applications, negotiated and determined what documents would be provided to MJ Consulting, and had a central role in communicating/obtaining the documents, including documents created by her coconspirators in furtherance of the conspiracy.

A defendant may qualify for a "managerial" enhancement based on circumstantial evidence that the defendant directed other participants to take steps in furtherance of the conspiracy.  For example, an individual may have a managerial role within a drug conspiracy if he directs others to deliver drugs:  For example, in *United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014), the Ninth Circuit held that the

district court did not abuse its discretion in applying an enhancement under § 3B1.1 when the defendant "oversaw" a "participant in the offense," who transported drugs as part of the drug conspiracy at the defendant's direction, even though the participant was not named in the indictment.  *Id.* at 1222.

In evaluating the appropriateness of an enhancement under § 3B1.1, the Ninth Circuit has considered not only whether a defendant managed indicted or unindicted co-conspirators – which is in itself sufficient – but also whether the defendant "exercised decision making authority" or "functioned in an organizational role" in the conspiracy.  *See United States v. Rivera*, 527 F.3d 891, 908-09 (9th Cir. 2008) (citing *United States v. Ponce*, 51 F.3d 820, 827 (9th Cir. 1995)).  In *Rivera*, the Ninth Circuit cited with approval cases analyzing whether the defendant had coordinated the conspiracy, negotiated on behalf of the conspiracy, and made decisions regarding the when, where, and to whom drugs would be sold.  Similarly, in *United States v. Ingham*, 486 F.3d 1068, 1074-75 (9 Cir. 2007), the Court of Appeals made clear that "exercis[ing] some degree of control" or "organizational authority over others" can be sufficient to sustain an enhancement under § 3B1.1.  "Organizational authority" can include organizing others "for the purpose of carrying out the crime."  *Id.* at 1074.

In this case, the evidence shows that MJ Consulting employees were aware of the false statements that Elena instructed them to submit to lenders, and still continued to offer their assistance in submitting the loan modifications and seeking their approval with the financial institutions. *Compare Anthony*, 280 F.3d 694 (holding that an attorney who conveyed the defendant's false statements to others but did not know the statements were false could not be considered a "participant."). For example, according to MJ Consulting records, on October 17, 2013, an MJ Consulting employee spoke to Defendant Elena Moreno regarding documents requested by the underwriter who was review one of the loan modification applications. According to the notes in MJ Consulting's file, Defendant Elena Moreno told MJ Consulting that she did not want to send the documents because "they already prepared

the taxes and it shows a lot of money," Ex. 5, at 51. Elena's statement implies that the taxes had different information than the other documents that had been submitted to the financial institutions, thereby putting MJ Consulting on notice that the documents they received from the Morenos were false. One of the documents that MJ Consulting had submitted on behalf of the conspiracy were letters in which coconspirator Fidencio claimed that the QAT was struggling financially, and that business was substantially less than in prior years. Despite that knowledge, MJ Consulting continued to participate by submitting those fraudulent documents to financial institutions on behalf of the conspirators.

Far from being an isolated incident, the MJ Consulting records reveal other evidence of false statements in the documents provided by the conspiracy.  On May 30, 2013 an underwriter informed MJ Consulting that the loan modification application had claimed that the Chesbro property was both a primary residence and that it was rented; two mutually exclusive claims. Ex. 5, at 44. On June 19, 2013, MJ Consulting was informed that the rent claimed on the loan modification applications differed from the rent reflected on the bank account statements. *Id*. at 45. On February 18, 2013 the underwriter notified MJ Consulting of numerous contradictions and falsities in documents submitted by the Morenos, including the omission of two properties from the 2011 tax return they submitted. *Id*. at 69.

As noted throughout those records, Defendant Elena Moreno was the primary contact between MJ Consulting and the coconspirators. According to employees for MJ Consulting, they primarily interacted and corresponded with Defendant Elena Moreno to obtain supporting documentation for the loan modification requests, including fraudulent supporting documentation.  Specifically, the MJ Consulting records refer to numerous requests from the underwriters of the loan modification applications that were transmitted to the conspiracy by MJ Consulting, through Defendant Elena Moreno. For example, on April 19, 2013 the underwriters asked for a mortgage statement, utility bills, or letter of explanation and MJ Consulting informed Elena of the request. Ex. 5, at 42. Three days later,

a mortgage statement was sent by MJ Consulting, which always obtained the requested documents directly from the conspirators. *Id.* On August 9, 2013, the records reflect that an underwriter requested paystubs, a request that MJ Consulting communicated to Defendant Elena Moreno. Less than a week later, MJ Consulting sent the requested documents. *Id.* at 47.. Similar transactions occurred during the period of August 21 to 26, 2013 (*id.* at 48); February 7-8, 2013 (*id.* at 55); April 15-22, 2013 (*id.* at 57); and January 22-29, 2013 (*id.* at 68). Elena was responsible for managing the submission of documents, which supported the fraudulent loan modification applications. The notes for MJ Consulting show that these submissions to the underwriter were material to the ultimate approval of the loan modification applications for Hillview and Cadiz. The evidence is not consistent with any suggestion that Defendant Elena Moreno merely acted as a "go-between." Rather, her managerial role is shown in part through her authority to decide what documents would be provided to MJ Consulting, and perhaps more tellingly, what documents *would not* be passed along to the underwriters.

Among the documents that were submitted to support the loan modification applications were receipts purportedly signed by the tenants of the different properties, including coconspirator Arturo and the family members residing in Chesbro. Other documents include letters of explanation signed by coconspirator Fidencio. Because MJ Consulting communicated with Defendant Elena Moreno, the submission of these documents shows her role in coordinating and organizing the conspiracy's response, including the creation of documents that would further the loan modification fraud. Directing coconspirators to take steps in furtherance of the conspiracy, such creating rental receipts and letters, warrants an enhancement under § 3B1.1(c).

**iii.** *Total Offense Level*

The Government agrees with the PSR that the total combined adjusted offense level is 27, and that the total offense level, after applying the adjustments for acceptance of responsibility, is 24.  PSR ¶¶ 40-47.

### b.  Section 3553(a) Factors

The factors set forth in Title 18, United States Code, Section 3553(a) include: (1) the nature and circumstances of the offenses; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; (6) the need to provide the defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentencing disparity among defendants involved in similar conduct who have similar records.  18 U.S.C. § 3553(a).  As explained in more detail below, the government believes that the recommended sentence of 33 to 37 months' imprisonment accounts for both the aggravating and mitigating factors set forth in § 3553(a).

### i.  The Nature and Circumstances of the Offense

As set forth in Defendant's plea colloquy, plea agreement [ECF No. 100, 101] and the PSR, the offenses to which Defendant Elena Moreno pled guilty reflect conscious, willful decisions that span multiple years to perpetrate, continue, and even expand the fraud.

With respect to Count 13, the conspiracy to commit bank and wire fraud, the conduct spans approximately 8 years.  More troublingly, it continued until July 2013, after the Defendant and her coconspirators knew they were under federal investigation because IRS-CI had executed a search warrant at their business, and many months after the Defendant and her coconspirators had appeared in

*GOVERNMENT'S SENTENCING MEMORANDUM*
*CR 12-750-LHK*

18

front of the Court after they were indicted in October 2012 for conspiracy to defraud the United States and false tax returns.  During that time period, the Defendant and her coconspirators submitted numerous applications to different financial institutions, which caused the approval of over $2 million dollars in home mortgages and lines of credit.  These loans were approved based on the false and fraudulent representations about the income and assets of the loan applicants, which included the Defendant and her husband, Fidencio.  As the bookkeeper for QAT and wife of Fidencio, the Defendant knew that the information in the applications she submitted or cosigned was false and fraudulent.  Far from suggesting that the Defendant was removed or unaware of the finances, the records for QAT and the personal bank accounts show that the Defendant was involved in everything from bookkeeping entries, to bank reconciliations, to writing/directing the issuance of checks on the different bank accounts.  The false and fraudulent loan applications overstated the income and assets of the applicants by tens of thousands of dollars; in the case of one application, the Defendant falsely stated that she was the owner of QAT.  As a result of their fraud, the Defendants successfully purchased and/or refinanced four different properties in San Jose: Hillview, Cadiz, Chesbro and Bayliss.  From 2005 through 2013, the Defendant and her coconspirators enjoyed these fruits of their fraud.  Without the fraudulently-obtained loans, the Defendant and her coconspirators would not have been able to purchase Hillview, Cadiz or Chesbro.

More recently, the evidence shows that the Defendant was heavily involved in attempting to keep the fruits of the fraudulent loan applications, through the submission of false and fraudulent loan modification applications, in some cases to the same financial institutions that were originally defrauded into lending money to the Defendant and her coconspirators.  The evidence shows that the Defendant and her coconspirators succeeded in part with this fraud as well; the fraudulent loan modification applications that they submitted were approved as to the Cadiz and Hillview properties.  *See* Ex 2, 5.

Based on the applications, the financial institutions forgave part of the principal for these fraudulently-obtained mortgages and lowered the monthly payments owed by the defendants.

In an attempt to keep the Chesbro and Bayliss properties, the Defendant filed for bankruptcy on three separate occasions. Each of these bankruptcy petitions was filed while the financial institutions were attempting to foreclose on the Bayliss and Chesbro properties, the latter of which was purchased using fraudulently-obtained loans. These bankruptcy filings, which were dismissed because the Defendant never filed the required schedules, had the effect of delaying the foreclosures, thereby buying more time to pursue fraudulent loan modifications as to these properties. These delays also caused additional losses to the financial institutions for Bayliss and Chesbro, in the form of legal expenses and unpaid interest on the loans.

Count 1, the conspiracy to defraud the United States, is similarly characterized by years of intentional, willful conduct spanning multiple years. As with the conspiracy to commit wire fraud and bank fraud, the evidence shows that the Defendant personally benefited from this fraud. She and her coconspirators intentionally caused the accounting firm to file false tax returns by not reporting cash receipts, which were not entered in QuickBooks, deposited in the business bank account, or otherwise reported to the accountant. The Defendant knew about this unreported income because she personally received a portion of it; she also assisted in counting the cash receipts and preparing monthly invoices for the Chuckchansi Casino that meticulously tracked these cash receipts. *See* Ex. 7. As with the loan modification applications, the evidence shows that the Defendant frequently communicated with the accounting firm, and was often the individual who provided supporting documentation for preparation of the false and fraudulent tax returns.

The occurrence of two separate frauds, which targeted not only the United States, but also multiple private financial institutions, is a cause for serious concern and is one of the reasons that a

substantial sentence of imprisonment should be imposed in this case.  Both of the schemes lasted for

extended periods of time.  Moreover, the evidence suggests that both would have continued, but for the

detection and prosecution of the defendants for their actions.  This conclusion is particularly warranted

as to the bank and wire fraud conspiracy, which was ongoing for many months after tax-related charges

were brought and while the case was pending before this Court.  *See* Ex. 2, 3, 5.

As to both conspiracies, the evidence shows that the defendants took numerous conscious steps

to continue them.  In the case of Count 1, each year the defendants provided false and fraudulent records

to the accounting firm.  The records provided were carefully calculated to avoid disclosure or detection

of the cash receipts.

In this case, the Defendant participated in a conspiracy to submit multiple applications to

fraudulently obtain loans from different financial institutions, then later submitted fraudulent loan

modification applications in an attempt to keep the fruits of their fraud.  The records show that the

Defendant and her coconspirators submitted not just one fraudulent loan application, but multiple

fraudulent loan applications over a series of years to different financial institutions in order to obtain

additional, fraudulent loans.  The defendants were able to obtain these loans, and thus

purchase/refinance the real properties, while paying little to no money out of pocket for the properties.

Although the Defendant and her coconspirators could have chosen to stop submitting fraudulent loan

applications and using those loans to purchase additional properties, they chose to do exactly the

opposite.  Then, when the banks sought to foreclose on the properties, the Defendant and her

coconspirators chose to fight the foreclosures and short sales by submitting false and fraudulent

applications to modify the loans.  *See* Ex. 5, 2.  The persistence and continuation of the conspiracy

through these fraudulent loan modification applications shows that the Defendant and her coconspirators

were motivated at least in part by greed, and a desire to keep their ill-gotten gains from their fraud.

*ii. The History and Characteristics of the Defendant*

The government acknowledges that the Defendant may have had a difficult upbringing, as well as challenges associated with becoming a mother at a young age.  PSR ¶¶ 57-73.  The Defendant does not have a college education, but did receive a GED certificate in 1994, years before the offenses of which she was convicted in this case.  *Id.* ¶ 73.  The defendant has no prior convictions, and her two prior arrests occurred more than ten years ago.  *Id.* ¶¶ 53-55.  The government also notes that the Court can and should consider that the Defendant accepted responsibility by pleading guilty and paid restitution related to Count 1 in advance of her guilty plea.  These mitigating factors are reasons why the government has asked that the Court impose a sentence of 33 to 37 months' imprisonment, which requires a downward variance from the Guidelines range.

The Court should not, however, exercise its discretion to vary further from the Guidelines' range because these mitigating factors, while important to consider, nonetheless occurred many years before the conduct at issue.  By the time the Defendant and her coconspirators chose to defraud the United States beginning in 2005, and also chose to commit bank fraud and wire fraud beginning in 2005, the Defendant had received her GED, had been married to Fidencio for approximately a decade, and had been working in various capacities as a receptionist for several years.  As emphasized by the Guidelines and their attention to loss and attempted loss, the crimes that the Defendant chose to commit where, at their essence, financial crimes motivated by greed.  The evidence shows that neither the Defendant nor her coconspirators needed or used the money that they obtained by their frauds to survive, or to provide the bare essentials for their family.  Rather, the evidence shows that what the Defendant and her coconspirators wanted (and obtained) was millions of dollars in fraudulent loans.  At the same time they sought and obtained loans that they were not entitled to, the Defendant and her coconspirators concealed nearly $1 million dollars in unreported income from the IRS.

*iii. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

A sentence of 33 to 37 months' imprisonment is sufficient, but no greater than necessary, to promote respect for the law and provide just punishment.  As discussed above, the Defendant's crimes stem from the coconspirators' desire to conceal money from the IRS and obtain money and property from private financial institutions to which they were not entitled.  The tax returns and loan applications vividly illustrate that the Defendant and her coconspirators willingly lied when, and as necessary, to maximize their financial gain: When filing tax returns with the IRS, the Defendant and her coconspirators consciously and purposefully underreported their income so they could pay less in taxes and keep more money for themselves.  When applying for loans, however, the Defendant and her coconspirators knowingly and willfully overstated the applicant's income and assets and omitted liabilities, to obtain money that did not belong to them and that they would not have received, had they accurately disclosed their financial circumstances.  The Court can and should take note that these conspiracies overlapped, meaning that in some years the Defendant and her coconspirators were submitting false loan applications overstating their income, sometimes just mere weeks or months before affirming false tax returns *understating* their income to the IRS.

Although the Defendant has paid restitution to the IRS, the Defendant and her coconspirators were successful in modifying the fraudulently-obtained loans for the Hillview and Cadiz properties, in which they still reside.  In effect, the Defendant and her coconspirators are still enjoying and benefiting from some of the fruits of their crimes.

No further downward departure and/or variance is warranted as to this Defendant for any of several reasons.  First, the Government's recommended sentence is based on just a portion of the actual loss suffered by the financial institutions; it does not take into account the losses suffered by the financial institutions that modified the Hillview and Cadiz loans to reduce those loans' principals, based

on the fraudulent loan modification applications.  Nor has the government sought a sentence based on the full amount of the fraudulently-obtained loans, although the Sentencing Guidelines do allow the Court to consider intended loss, which here would exceed $2 million.  *See* § 2B1.1, cmt. 3(A)(ii).  Here, the evidence indicates that the object of the conspiracy was to obtain the entirety of these loan amounts for the personal use and benefit of the Defendant and her coconspirators.

Both of the crimes of which the Defendant stands convicted are serious, not only because of their duration, but due to the manner in which the Defendant and her coconspirators chose to carry them out. As set forth in the plea agreement, the Defendant and others agreed and coordinated the submission of false tax returns and loan applications.  The planning and execution of this scheme reflects conscious, willful choices to knowingly violate the law.  In the case of the conspiracy to commit wire and bank fraud, the Defendant and her coconspirators demonstrated sophistication in timing their applications to avoid the financial institutions discovering/detecting other loan applications that were pending at the same time.  Despite warnings to provide true and accurate information, the Defendant and her coconspirators repeatedly chose to provide false and fraudulent information on the loan applications.

The actions of the Defendant and her coconspirators after they learned of the federal criminal investigation demonstrate a complete lack of respect for the law.  For example, after IRS-CI executed a search warrant, the Defendant and her coconspirators switched accounting firms.  When they initially met with the new accounting firm, neither the Defendant nor her coconspirators provided information on their cash receipts; only after the firm learned of the criminal case and asked for this information did the defendants provide some information about case receipts. Similarly, the Defendant's decision to file for bankruptcy in an effort to prevent the financial institutions from recouping properties that were the fruits of the fraud shows greed and a willingness to violate the law to further their own goals.  Moreover, the Defendant and her coconspirator's decision to continue the bank and wire fraud conspiracy by

submitting fraudulent loan modification applications demonstrate a lack of respect for the law, especially since this conspiracy continued after the Defendant had been charged in this very case with tax-related crimes.

*iv. The Need for the Sentence Imposed to Afford Adequate Deterrence and to Protect the Public*

Adequate deterrence can only be accomplished through a lengthy term of imprisonment. Such a sentence will make clear that violating the laws in question will not merely result in monetary penalties that can be factored into the cost of such choices, but rather carry serious consequences designed to both punish the conduct and deter others from engaging in it.

There is little question that many taxpayers seek to hide their income and do not report all of it to the IRS. There is also little question that other current and would-be homeowners seek to apply for loans, or loan modifications, to which they are not entitled. Deterring like-minded individuals cannot be accomplished with a probationary sentence or monetary penalties alone. If anything, the Defendant and her coconspirators' decision to continue with the bank and wire fraud conspiracy after being charged with tax crimes appears to have been motivated in part by a calculated decision that they were unlikely to be caught. Although the payment of restitution to the victims of the crimes is part of the Defendant's plea and appropriate, a sentence of imprisonment is necessary to make crimes such as these not worth committing. The punishment must be more than just the cost of doing business if criminal activity is to be deterred.

There is a strong public interest in deterring the crimes implicated in this case. "Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws . . . Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S.S.G. § 2T, intro. commn. Similarly, the number of criminal prosecutions for bank and wire fraud relative to

their incidence is small, making the same deterrence considerations applicable.  The deterrence interest

is all the more pronounced in a case such as this one, where the duration is prolonged and the

participants dedicated to continuing the frauds.  In the government's view, anything less than the

recommended sentence would send a problematic message, in part because the potential rewards from

committing these crimes (if not detected and thus left unpunished) can be so great.  Had the Defendant's

and her coconspirators' crimes not have been detected, they would have reaped the illegal financial

windfall of evading taxes on nearly $1 million dollars in income, and received over $2 million dollars in

loans through fraudulent loan applications, then fraudulently induced the financial institutions to forgive

part of those fraudulently-obtained loans, while keeping the underlying real properties. A sentence that

includes a substantial period of incarceration is necessary to send a message to the community that this

conduct is not worth engaging in.

In determining the Defendant's sentence, the Court should also take into account the sentence for

her codefendant, Fidencio.  Fidencio, who has pleaded guilty pursuant to Rule 11(c)(1)(C), has agreed

that an appropriate sentence is 41 months' of imprisonment. A sentence of 33 to 37 months'

imprisonment would help ensure that similarly-situated defendants receive similar treatment.

III.     **RESTITUTION & FORFEITURE**

a.   **Restitution**

Under the MVRA, 18 U.S.C. § 3663A, a court must order a defendant to make restitution to a

victim of certain specified offenses, without considering the defendant's economic circumstances.  *See*

*United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012), *overruled in part on other grounds by Robers v.*

*United States*, 134 S.Ct. 1854 (2014).  The MVRA defines "victim" as "a person directly and

proximately harmed as a result of the commission of the offense for which restitution may be ordered."

§ 3663A(a)(2).  In the "primary and overarching goal of [the MVRA} is to make victims of crime

whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004). In a fraud case, restitution to persons "directly and proximately harmed" by the fraud is mandatory. 18 U.S.C. §§ 3663A(a)(1), (2); *see also United States v. Carter*, 742 F.3d 440, 446 (9th Cir. 2014).

Section 3663A(b)(1) sets forth the framework for calculating restitution, which the Ninth Circuit has used in cases involving a defendant's fraudulent scheme to obtained secured real estate loans from lenders. *Yeung*, 672 F.3d at 601 & n.4. Generally, the district court should calculate a direct lender's loss by determining the amount of the unpaid principal balance due on the fraudulent loan, less the value of the real property collateral as of the date the direct lender took control of the property. *United States v. Hutchison*, 22 F.3d 846, 856 (9th Cir. 1993), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997).

Because restitution is meant to cover a victim's actual losses, the Ninth Circuit has also approved restitution awards to include other amounts in fraudulent loan cases, such as prejudgment interest (using the government loan rate), interest still due on the loan, and expenses associated with holding the real estate collateral that were incurred by the lender before it took title to the property. *Id.* at 856; *see also Yeung*, 672 at 601; *see also Catherine*, 55 F.3d 1462, 1464-65 (9th Cir. 1995) (affirming restitution order that included prejudgment interest). A lender generally takes control on the date the lender either receives the net proceeds from the sale of the collateral to a third party at the foreclosure sale, or takes title to the real estate at the foreclosure sale. *Id.*

As discussed above, the government respectfully submits that the Court should order restitution consistent with the plea agreement, which includes losses associated with the Bayliss and Chesbro properties. These losses are discussed above: they include the 2012 forgiveness of indebtedness by Wells Fargo Bank as to Chesbro, the losses to Wells Fargo Bank associated with the 2013 short sale of

Bayliss, and the losses to NationStar mortgage associated with the 2014 foreclosure of Chesbro.  The losses for which the government seeks restitution were the actual losses incurred by these financial institutions and were not compensated by collateral or repayment.  Further, consistent with *United States v. Morgan*, 376 F.3d 1002, 1014 (9th Cir. 2004), the amount includes prejudgment interest, contractual interest, and finance charges. It also includes other costs incurred by the respective financial institutions that were associated with the actions in question, such as the foreclosure and/or short sale.  Thus, the total amount of restitution should be $202,597.28 to NationStar Mortgage and $237,137.94 to Wells Fargo bank ($33,578.35 for the debt that Wells Fargo forgave in 2012 as to Chesbro and $203,559.59 for the Bayliss short sale).

Consistent with the plea agreement, the government has not and does not seek restitution for losses associated with the other properties, Hillview and Cadiz.  Consistent with its obligations under the MVRA, the government does note that Bank of America and Wells Fargo are likely victims of Count 13 within the meaning of § 3663A, because both financial institutions reduced the principal on loans that they held based on the false and fraudulent representations that the Defendant and her coconspirators made in loan modification applications to them.  *See* Ex. 4. As discussed above, Bank of America reduced the principal on the Cadiz loan by $39,627.60.  Wells Fargo reduced the principal on the Hillview loan by $53,576.08. The government became aware of these losses after receiving discovery pursuant to the subpoenas issued to prepare for sentencing in this case.

b.  **Forfeiture**

The government agrees with the PSR that the forfeiture is mandatory in this case because the Defendant was convicted of a crime that provides for forfeiture as part of the penalty. *See* PSR ¶ 98, 18 U.S.C. § 982(a)(2)(A).  The government would also note that the Defendant's plea agreement does not

address forfeiture and there is no agreement regarding forfeiture.  The government is addressing the

question of forfeiture here because it was raised in the PSR.

Section 982(a)(2)(A) provides, in relevant part, that the court "in imposing sentence on a person

convicted of a violation of, or a conspiracy to violate . . . (A) section . . . 1343, or 1344 of this title,

affecting a financial institution . . . shall order that person forfeit to the United States any property

constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of such

violation."  The Ninth Circuit has held that forfeiture is mandatory in cases where this statute applies.

*Carter*, 742 F.3d at 446; *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989); *United States v.*

*Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011) ("the district court has no discretion to reduce or

eliminate mandatory criminal forfeiture").  In such instances, a defendant "may be required to pay

restitution and forfeit the same amounts."  *Carter*, 742 F.3d at 446 (citing cases).  Further, a defendant

has no right to a credit against a restitution order equal to any part of the amount forfeited.  *Id.*

In this case, the property that was derived from proceeds that the Defendant and her

coconspirators obtained directly or indirectly pursuant to the conspiracy to commit bank and wire fraud,

include the real properties Hillview and Cadiz.  They also include the amount of the loans approved and

paid out by the financial institutions.  The total amount of those loans was $2,118,000.  The government

believes that the probation officer has properly and accurately stated the law in the PSR.  The

superseding indictment did include a forfeiture notice.  [ECF No. 64]

IV.     **CONCLUSION**

The United States' concurs with the PSR's total offense level calculation.  Based on the

foregoing, the United States recommends that Defendant Elena Moreno be sentenced to a term of 33 to

37 months' imprisonment, 3 years' supervised release, and restitution to the financial institutions that

were defrauded.  The government submits that this sentence is sufficient, but not greater than necessary,

*GOVERNMENT'S SENTENCING MEMORANDUM*
*CR 12-750-LHK*

1  to accomplish the goals of the Sentencing Reform Act and that a lesser sentence is not supported by the

2  facts or the application of the factors under 18 U.S.C. § 3553(a).

3

4  Dated this 15th day of January, 2015.

5                                              Respectfully submitted:
                                               MELINDA HAAG
6                                              United States Attorney

7
                                                /s/ _Katherine L. Wong_
8                                              KATHERINE L. WONG
                                               Assistant United States Attorney
9                                              Eastern District of Virginia

10                                              _/s/ Todd P. Kostyshak_
                                               TODD P. KOSTYSHAK
11                                             Trial Attorney, Tax Division

12                                             Attorneys for the United States

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  *GOVERNMENT'S SENTENCING MEMORANDUM*
    *CR 12-750-LHK*
                                        30

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Government's Sentencing Memorandum was served on all parties named below on January 15, 2015.

___ United States Mail, postage prepaid
___ Hand delivery
___ Facsimile Transmission (fax)
___ Federal Express
_X_ ECF Filing

Nanci Clarence
Gina Moon
Clarence Dryer & Cohen LLP
899 Ellis St
San Francisco, CA 94109
nclarence@clarencedyer.com

*Attorneys for Elena Moreno*

                                        */s/ Katherine L. Wong*
                                        Katherine L. Wong